**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────────────

**STACEY LAMAR,**

                                **Plaintiff,**

        **vs.**                                    **1:09-CV-1154**
                                              **(MAD/DRH)**

**THE INSTITUTE FOR FAMILY HEALTH and**
**DR. JOHN McANDREW,**

                           **Defendants.**

─────────────────────────────────────────

**APPEARANCES:**                                   **OF COUNSEL:**

OFFICE OF RUSSELL A. SCHINDLER       Russell A. Schindler, Esq.
245 Wall Street
Kingston, New York, 12401
*Attorney for Plaintiff*

BABCHIK & YOUNG, LLP                 Jack Babchik, Esq.
200 East Post Road                         Siobhan A. Healy, Esq.
2nd Floor
White Plains, New York 10601
*Attorneys for Defendant*
*The Institute For Family Health*

KENNY, STERNS & ZONGHETTI         Gino A. Zonghetti, Esq.
26 Broadway
New York, New York 10004
*Attorneys for Defendant*
*Dr. John McAndrew*

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

      Plaintiff Stacey Lamar, alleges that defendant The Institute For Family Health ("IFH")

discriminated against her based on her gender in violation of 42 U.S.C. § 2000e *et seq*. ("Title

VII").  Plaintiff also alleges a state law claim for battery against defendant Dr. John McAndrew

("McAndrew") and IFH under the theory of *respondeat superior*.[1]  Presently before the Court are defendants' motions (Dkt. Nos. 21 and 23) pursuant to Fed. R. Civ. P. 56 seeking summary judgment and dismissal of plaintiff's amended complaint.[2]

## FACTS AND BACKGROUND[3]

In 1998, the Mid-Hudson Family Health Institute ("Mid-Hudson") maintained an Obstetrics/Gynecological office within Kingston Hospital referred to as the Specialty Care Center ("SCC").  In 1998, McAndrew was employed by Mid-Hudson at the SCC as a Doctor of Obstetrics and Gynecology.  In 2003, plaintiff was hired by Mid-Hudson as a part time nurse-midwife and worked at another Mid-Hudson facility in Hyde Park.  At some point prior to June 2004, plaintiff began working part time at the SCC.  In June 2006, plaintiff became a full time Mid-Hudson employee at the SCC.

On February 1, 2007, IFH agreed to purchase Mid-Hudson's assets.  IFH implemented a new administrative structure which included Dr. Neil Calman as Chief Executive Officer, Dr. Robert Schiller as Vice President, and Nicole Nurse as Vice President of Clinical Affairs.  Dr. Walter Woodley was previously employed by Mid-Hudson as the Medical Director of the Kingston Family Practice Center.  IFH promoted Dr. Woodley to Regional Director of the Upstate Region and Dr. Woodley became McAndrew's supervisor.  At the relevant time, Anne Barnhart

---

[1]  On June 25, 2010, District Judge Gary L. Sharpe dismissed all Title VII claims against McAndrew.

[2]  McAndrew also requests, should the Court grant IFH's motion for summary judgment and dismissal of the Title VII claims, that the Court decline to exercise supplemental jurisdiction over plaintiff's state court claims.

[3]  The background set forth in this section is taken from: (1) defendants' Statements of Material Facts and plaintiff's responses therein; (2) the exhibits and evidence submitted by defendants in support of the motions for summary judgment; and (3) the exhibits and evidence submitted by plaintiff in opposition to the motion for summary judgment.  The Court has reviewed defendants' Statements of Material Facts to ensure that they are supported by the record.  The Court notes that plaintiff also submitted "Additional Statement of Material Facts".  To the extent that the "facts" are supported by the record, the Court will consider them in the context of the within motion.  The facts recited are for the relevant time period as referenced in the complaint.

was the Director of Medical Staff Affairs and Credentialing.  Ms. Barnhart was responsible for overseeing the scheduling of providers for call, office and hospital rounding and gave the final approval for all time off to those providers.

On February 23, 2007, Dr. Calman wrote a letter to plaintiff and offered plaintiff a full-time position as a Certified Nurse Midwife at the SCC at Kingston Hospital.  Plaintiff was advised that she would report to, "Medical Director, Specialty Care Center of Kingston".  At approximately the same time, IFH offered McAndrew the full time position of Obstetrician/Gynecologist and Medical Director of the SCC.  McAndrew supervised plaintiff with respect to the medical services provided.  McAndrew did not have the authority to hire or fire personnel, he was not responsible for determining salary or benefits and he did not make employee schedules.

In July 2007, IFH created an Employee Handbook.   Within the handbook, a section entitled "Conditions of Employment" with subsection, "Protected Class Harassment Policy and Complaint Procedure" provided:

> If you believe you have been subjected to or witnessed protected class harassment you must report this to any supervisory employee or the Human Resources Team immediately.  The Human Resources Team is also available to provide information to employees about the Institute's policy on protected class harassment and the complaint process.
>
> A confidential, anonymous Hotline is available for employees who wish to register a complaint under this policy anonymously.  Use of this Hotline should be restricted to those employees who wish to remain anonymous.

On September 21, 2007, plaintiff signed an acknowledgment averring that she read the Employee Handbook and understood the contents.  McAndrew also acknowledged that he

received the Handbook.  Currently, plaintiff is employed by defendant as a Registered Nurse
Midwife but has been on disability leave since January 27, 2009.

Plaintiff's Personal and Professional Relationship with McAndrew

From June 2004 until December 2004, plaintiff and McAndrew engaged in an extra-
marital affair.  After the affair ended, the parties remained close, spoke daily and had lunch
together nearly every Tuesday.  From 2006 through 2008, plaintiff would "routinely" give
McAndrew a hug and a kiss if she hadn't seen him for a few days.  The kisses were "on the lips"
and the hugs were "spontaneous" and never forced by McAndrew.

Plaintiff claims that she had a good working relationship with McAndrew until October
2006 when he became "jealous" and began monitoring her leave time.  Plaintiff claims that
McAndrew was jealous that plaintiff took a vacation with her husband and made inappropriate
comments.  In the complaint, plaintiff alleges that in December 2006, McAndrew stored two
handguns and some pornographic pictures in plaintiff's credenza without plaintiff's knowledge.
McAndrew denies this allegation.  In Spring or Summer 2007, plaintiff claims that she began to
feel intimidated and fearful of McAndrew because of the gun incident.  Plaintiff claims that
McAndrew made comments regarding her husband's desire to buy her a diamond ring.
Specifically, plaintiff claims that McAndrew wanted to accompany plaintiff to the jewelry store.
In May 2007, plaintiff underwent breast augmentation surgery and claims that McAndrew
demanded to see her breasts.  Plaintiff claims she reluctantly agreed and revealed her partially
bandaged breasts. Plaintiff also claims she allowed McAndrew to feel her breasts.  During this
time, plaintiff also claims that defendant would linger in the locker room while she was changing
to watch her undress.  In November 2007, McAndrew had bi-lateral hip surgery and called
plaintiff to help him perform a fecal disimpaction, a medical procedure which she had

previously performed as a nurse.  Plaintiff agreed to assist McAndrew but told him the next day

that she was uncomfortable performing the procedure as she had not performed it in years and that

she was angry because McAndrew's fiancé was present during the procedure.  In April 2008,

plaintiff attended a conference in San Antonio, Texas.  Plaintiff claims that McAndrew suggested

that he join plaintiff for the weekend and plaintiff declined.  During the summer of 2008, plaintiff

claims that McAndrew made derogatory statements to her regarding her use of personal time such

that plaintiff failed to take off necessary time to address medical problems.

On the morning of October 16, 2008, plaintiff and McAndrew had a discussion about a

conference that McAndrew was planning to attend in December in New York City.  Plaintiff

suggested that they meet for dinner.   Plaintiff claims that she had just taken two days off to

vacation with her husband in Maine and that McAndrew as jealous.  Later that day, plaintiff and

McAndrew had an argument about plaintiff's excessive time off.  The argument was "loud" and

plaintiff testified that McAndrew yelled and screamed that she had taken "40 f'ing days off" and

that she was "acting like a high school girl".  Plaintiff testified that after the argument, McAndrew

approached her and said, "I guess this means you are not going to want to come to New York".

After that argument, plaintiff believed that McAndrew was concerned with her taking time off to

be with other people, "[b]ut if I take time off with him, it's okay".

On December 11, 2008, McAndrew entered plaintiff's office prior to leaving for the day.

Plaintiff "knew instinctually" that McAndrew wanted to hug her so plaintiff stood up from her

desk, walked around the desk and opened her arms to embrace McAndrew.  McAndrew did not

verbally ask plaintiff to hug him.  McAndrew hugged plaintiff and plaintiff claims he told her that

she smelled good.  The hug lasted thirty seconds during which plaintiff had her arms around

McAndrew's shoulders.  Plaintiff claims that McAndrew reached down and briefly squeezed her

buttocks.  Plaintiff never told McAndrew to stop hugging her and McAndrew did not, in any way, force plaintiff to participate in the hug.

On December 12, 2008, plaintiff voluntarily went to New York City to meet McAndrew and one of his colleagues for dinner.  Plaintiff met McAndrew at his hotel and accompanied him to his room to see the view.  While plaintiff was looking out the window, McAndrew stood up behind her and McAndrew's stomach pressed against her back.

Plaintiff's Complaints

In the late afternoon or early evening on October 16, 2008, plaintiff called Dr. Robert Schiller on his cell phone.  Dr. Schiller received the call while driving with Dr. Calman.  Dr. Schiller testified that plaintiff, "told me that she was concerned about something related to her employment" and said, "there was an urgency to it".  Plaintiff testified as follows:

> Q.   What did he say to you and what did you say to him during the conversation?
>
> A.   I asked, you know, am I speaking with Dr. Schiller and he said yes, and I told him who I was and I asked him if he had already left New Paltz.  They were in New Paltz for whatever meeting they had set up because I really wanted to speak with him and was hoping to catch him before he headed back to the city, and he explained that he and Dr. Calman were already en route home and he asked what was the problem, you know, did I want to speaking with him on the phone, and I told him that I really didn't feel comfortable speaking on the phone.  I really needed to see him personally to have a conversation, at which point I do believe I got choked up because I was just pent up with a combination of emotions and was crying and he asked what was the matter, and I said I really can't discuss this over the phone, it's not appropriate, and I said, you know, I will speak to you, if it's more convenient I will come to New York to see you to speak to you if that, you know, doesn't put you out.  I just needed to schedule a meeting as soon as possible and he said he would call me the next day by noon, and that was that pretty much.

Pl's. Dep. 384-388.

Plaintiff further testified:

> Q.   During any of the conversation with Dr. Schiller, did you indicate in any way your complaint related to Dr. McAndrew?
>
> A.   I did not talk about John's name on the phone, no.
>
> Q.   Did you indicate in any way that you were calling regarding a complaint of harassment or discrimination?
>
> A.   I told him I didn't want to discuss the essence of what I had to talk about over the phone.

*Id*.

Dr. Schiller offered to speak with plaintiff over the telephone but plaintiff, "didn't feel it was appropriate conversation to have over the phone". Dr. Schiller did not return plaintiff's telephone call.

In October 2008, plaintiff also complained to Ms. Barnhart that McAndrew was, "giving her a hard time about taking time off". Plaintiff did not use the term "sexually harassing" to describe McAndrew's behavior. Plaintiff did not tell Ms. Barnhart about her prior romantic relationship with McAndrew.

On November 11, 2008, plaintiff injured her hand during the course of her employment. On December 16, 2008, plaintiff re-injured her hand while tending to a patient in labor. On December 18, 2008, plaintiff advised Ms. Barnhart that she was cleared to return to work but stated that she was "concerned about returning to work because she anticipated that Dr. McAndrew's reaction to her having been off for several weeks would be negative".

On December 20, 2008, plaintiff spoke with Dr. Woodley regarding McAndrew's monitoring of her time off. Plaintiff did not tell Dr. Woodley that she believed McAndrew was jealous nor did she tell him of their prior romantic relationship. Plaintiff testified that Dr.

7

Woodley told her that he would speak with McAndrew and "get back to [her] at some point".

On January 5, 2009, plaintiff contacted Ms. Barnhart because she was nervous about how McAndrew was going to respond to her time off.  Later that day, plaintiff spoke with Dr. Woodley.  Plaintiff testified:

> A.    . . . I think he told me that he had a conversation with Dr. McAndrew privately and Dr. McAndrew didn't see a problem, and I explained to him that I needed to discuss issues with him that Dr. McAndrew wouldn't address or openly admit to and I would really like to have a conversation with Dr. Woodley personally, as soon as possible, and he told me that he would like to include Dr. McAndrew, and I told him that I didn't feel I could speak openly in front of Dr. McAndrew.  And he said then he would like to have human resources, and I said that was fine, and he said he would arrange it and get back to me.

During that conversation, plaintiff did not indicate that the issues were related to sexual harassment.

On January 26, 2009, Dr. Stephen Hermele, plaintiff's psychiatrist, prepared a letter addressed to plaintiff that provided:

> As to the consequences of the injury to your left hand and its subsequent exacerbation, you have experienced significant anxiety which by itself has made it increasingly difficult for you to function at work.  The hostile work environment you have complained of has compounded your difficulties to the point where you can no longer function at work due to marked worsening of your anxiety. Accordingly I have advised you to suspend your professional efforts until further notice.
>
> I trust this note will be adequate for your needs.

On January 27, 2009, plaintiff gave Dr. Hermele's note to Ms. Barnhart.

<u>IFH's Response to Plaintiff's January 2009 Complaint</u>

Within three days of receipt of Dr. Hermele's note, Dr. Calman retained Anthony Shaw, an independent consultant with significant experience in Human Resource matters, to investigate

plaintiff's allegations.  On January 30, 2009, Mr. Shaw contacted plaintiff and asked her to draft a letter detailing her allegations.  On February 12, 2009, plaintiff's counsel responded to Mr. Shaw and provided details of McAndrew's alleged harassment and included the EAS Questionnaire submitted to the U.S. Equal Employment Opportunity Commission ("E.E.O.C.").  Plaintiff identified co-workers Betty Diorio, Elba Benitez and Karen Leone as having similar experiences with McAndrew.

Upon receipt of plaintiff's February 2009 letter, Mr. Shaw asked Maureen Duffy, a member of IFH's Human Resources Team to assist him in his investigation.  Furthermore, Mr. Shaw spoke with Drs. Calman, Schiller and Woodley about plaintiff's allegations.

On March 6, 2009, Mr. Shaw provided his preliminary findings to plaintiff's counsel.  On March 11, 2009, plaintiff's counsel responded to Mr. Shaw.  On March 26, 2009, Mr. Shaw contacted McAndrew, via email, and advised him of plaintiff's complaint and IFH's investigation.  Mr. Shaw advised McAndrew that his cooperation was required and asked for a written, signed statement responding to the allegations.  On March 31, 2009, McAndrew provided a response stating that the problems with plaintiff arose in late 2008 when he asked plaintiff not to take as many days off in 2009 as she had in 2008.  McAndrew denied any inappropriate conduct.

On April 17, 2009, Mr. Shaw emailed plaintiff's counsel with several follow up questions including names of witnesses who could corroborate plaintiff's claims.  On April 21, 2009, plaintiff's counsel responded and posed additional questions.

On May 27, 2009, Mr. Shaw issued a report detailing his findings.  Specifically, Mr. Shaw found:

> Lamar's allegations that Dr. McAndrew spoke and acted inappropriately in front of staff, openly questioned her leave status and

time off, and was disrespectful primarily toward female staff, were substantiated secondarily by similar comments by other staff.

Mr. Shaw found, "McAndrew's substantiated pattern of conduct is determined to be in violation of the Institute's anti-harassment policy". As a result of the investigation, IFH demoted McAndrew from the position of Medical Director. McAndrew was required to participate in harassment training at his own expense. On October 3, 2009, McAndrew completed a course entitled Preventing Discrimination and Sexual Harassment (Managers).

E.E.O.C. Complaint

On January 27, 2009, plaintiff filed a complaint with the E.E.O.C. In the complaint, plaintiff designated McAndrew as her immediate supervisor and the date of harm as December 11, 2008 and December 12, 2008. Plaintiff described the alleged discriminatory acts as follows:

> Dr. McAndrew had been complaining that I took off more time than entitled to take and did investigate the number of days off I had taken. Despite his complaints he nonetheless had me take a half day off to accompany him to a social event in Manhattan. He later referred to this as one of his "perks".
>
> Dr. McAndrew touched me inappropriately, insisting upon a hug, kiss and squeeze during which he felt my buttocks.

Plaintiff described other alleged discriminatory conduct:

> In the days preceding the above, Dr. McAndrew did insist upon a morning hug, kiss and squeeze of my buttocks. He also stayed in the locker room frequently when getting changed for surgery so as to be able to watch me change my clothes. If I tried to go to the ladies room to change, he would comment or behave as if offended. He often would say to me "blow me" or "bite me". He would behave miserably towards me if I took vacation time to spend with my husband. If I didn't start the day with a kiss, hug and squeeze of my body, he acted in a hostile manner towards me and the rest of the staff. Whenever I tried to avoid his advances and discourage him, he became increasingly bitter and difficult to work with. After speaking several times with his supervisor, Dr. Woodley and Anne Barnhart, about his becoming more difficult to work with in August and September of

10

2008, no actions were taken to address the situation.  I then attempted
to bring this to the attention of Dr. Red Schiller, company Vice-
President.

Defendant IFH moves for summary judgment and dismissal of plaintiff's Title VII claims.

Defendant's motion is based upon variety of theories.  Specifically, defendant argues that

summary judgment is warranted because: (1) McAndrew's conduct occurred prior to IFH's

purchase of Mid-Hudson's assets; (2) McAndrew's conduct occurred more than 300 days prior to

plaintiff's E.O.C. complaint; (3) plaintiff's work environment was not hostile by an objective

measure; (4) plaintiff cannot impute any alleged discriminatory conduct by McAndrew to IFH ;

and (5) IFH may not be held liable for battery under the doctrine of *respondeat superior*.

Defendant also argues, in the alternative, if plaintiff's claims survive summary judgment,

plaintiff's recovery is limited under the New York Workers' Compensation law.  Defendant

McAndrew moves for summary judgment and dismissal of plaintiff's claim for battery or, in the

alternative, for dismissal of plaintiff's battery claim pursuant to 28 U.S.C. § 1367(c)(3).

**DISCUSSION**

**I.     Standard on Motion for Summary Judgment**

Summary judgment is appropriate where there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive

law determines which facts are material; that is, which facts might affect the outcome of the suit

under the governing law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986).  A party

moving for summary judgment bears the initial burden of demonstrating that there is no genuine

issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

*see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the

light most favorable to the nonmovant, determines that the movant has satisfied this burden, the

11

burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen 'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56©).

## II.    TitleVII

Title VII forbids an employer from discriminating against employees with respect to "compensation, terms, conditions, or privileges of employment," or "limit[ing], segretat[ing], or classify[ing] . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" on the basis of race, color, religion, sex or national origin. *Patrolmen's Benevolent Ass'n of The City of N.Y. v. The City of N.Y.*, 310 F.3d 43, 51 (2d Cir. 2002) (citing 42 U.S.C. § 2000e-2(a)).

Here, plaintiff alleges that defendant's Title VII violations included subjecting plaintiff to a hostile work environment based upon her gender. Specifically, plaintiff claims that McAndrew engaged in a pattern of harassment and acted in a controlling and jealous manner. Plaintiff claims that she was intimidated and frightened by McAndrew's actions which included:  (1) demanding

to see plaintiff's breasts; (2) watching plaintiff undress; (3) commenting on her bras; (4) making

jealous comments when she spent time with her husband; (5) requesting plaintiff come to his

home to perform a fecal disimpactation; (6) controlling plaintiff's time off; (7) squeezing

plaintiff's buttocks; and (8) placing guns and pornography in plaintiff's credenza drawer.

### III.   Successor Liability

Defendant argues that plaintiff is precluded from relying upon McAndrew's alleged

sexually harassing or discriminatory acts that occurred prior to IFH's purchase of Mid-Hudson's

assets in 2007.  Plaintiff did not respond to this argument.

"In the context of a Title VII action, successor liability operates as 'an extra-contractual

remedial tool for imposing certain labor obligations on a new employer that has taken over

operations of an old employer'".  *E.E.O.C. v. Nichols Gas & Oil, Inc*., 518 F.Supp.2d 505, 510

(W.D.N.Y. 2007) (citations omitted).  District and appellate courts routinely apply the doctrine of

substantial continuity to Title VII cases.  *Id*. at 511 (citations omitted).   Under the substantial

continuity test, courts are guided by three factors: (1) whether the successor had notice of the

claim prior to the acquisition; (2) whether the successor substantially continued the business

operations of its predecessor following the acquisition; and (3) whether the predecessor is able to

provide the relief sought.  *Id*. (citing, *inter alia, E.E.O.C. v. Barney Skanska Constr. Co.*, 2000

WL 1617008 at *2 (S.D.N.Y. 2000)).  "No one factor is controlling, and it is not necessary that

each factor be met to find successor liability."  *Barney Skanska Constr. Co.*, 2000 WL 1617008 at

*2.

### A.   Notice

Defendant claims there is no evidence that IFH was aware of plaintiff's purported claims

against McAndrew at the time of the asset purchase. The Asset Purchase Agreement is dated

February 1, 2007 and does not reference any pending claims or litigation involving plaintiff. Moreover, by her own admission, plaintiff did not attempt to complain about any incidents, harassing or otherwise, involving McAndrew until October 2008.  Therefore, IFH did not have notice of plaintiff's claim and this factor weighs in defendant's favor.

## B.      Continuity

With respect to continuity, the court should consider the identity of the workforce and physical location.  *Id*.; *E.E.O.C. v. Local 638*, 1988 WL 25151, at *13 (S.D.N.Y. 1988).  After purchasing Mid-Hudson's assets, IFH continued to operate Mid-Hudson's offices as medical facilities.  Further, defendant retained many of Mid-Hudson's employees and those employees continued to perform the same or similar functions at IFH including plaintiff, McAndrew, Dr. Woodley, Dr. John Anderson, Yvonne Dickerson and Elba Benitez.[4]  *See Abdel-Khalek v. Ernst & Young, L.L.P.*, 1999 WL 190790, at *8 (S.D.N.Y. 1999).  Accordingly, this factor weighs in favor of successor liability.

## C.      Ability of Predecessor to Provide Relief

As to the third factor,

> Failure to hold a successor employer liable for the discriminatory practices of its predecessor could emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or with a complete remedy. In the case where the predecessor company no longer had any assets, monetary relief would be precluded.... Similarly, where relief involved seniority, reinstatement or hiring, only a successor could provide it.

---

[4] Dr. Woodley testified that prior to the change in ownership, Dr. Anderson was his immediate supervisor. Currently, Dr. Anderson is employed by IFH as the Medical Director for the Port Ewen Family Practice Center. Yvonne Dickerson (medical assistant) and Elba Benitez (Regional Director of Nursing) were employed by Mid-Hudson and remained with IFH after the asset purchase in 2007.

*Fennell v. TLB Plastics Corp.*, 1989 WL 88717, at \*4 (S.D.N.Y. 1989) (citing *E.E.O.C. v. MacMilan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091-92 (9th Cir. 1974)).

Defendant presents no argument or evidence with regard to the predecessor's, Mid-Hudson's, inability or ability to provide relief. *But Cf. Local 638*, 1988 WL 25151, at \*13 (the defendant presented evidence that the predecessor ceased to exist); *cf. Fennell*, 1989 WL 88717, at \*4 (the defendant provided evidence that the predecessor's financial position precluded a monetary award).

Considering all factors, while notice is lacking, there is substantial continuity between IFH and Mid-Hudson and further, there is no evidence that Mid-Hudson could provide plaintiff with relief, should she prevail. Under these circumstances, a reasonable fact finder could determine that IFH is a successor to Mid-Hudson. Thus, defendant's motion for summary judgment on this theory is denied. *See Parker v. Metro. Transp. Auth.*, 97 F.Supp.2d 437, 452 (S.D.N.Y. 2000) (the defendant failed to address the factors under caselaw and merely argued, in conclusory fashion).

## IV.   Conduct that Occurred More Than 300 Days Prior to Plaintiff's E.E.O.C. Complaint

Defendant argues that plaintiff's claims relating to the December 2006 incident involving guns and pornography are precluded as untimely as the incident allegedly transpired two and a half years prior to plaintiff filing a complaint with the E.E.O.C. Plaintiff claims that the allegations involve the same individuals, the same work location, and the same basic motivation and are thus, sufficiently related.

A plaintiff must file a charge regarding discrimination with the EEOC within 300 days of the alleged discriminatory conduct. Under the continuing violation doctrine, a plaintiff may bring suit based on conduct that occurred outside of the statute of limitations period, provided that the

conduct is a result of specific discriminatory policies or practices. *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994).  If the alleged conduct falls outside of the 300-day period, a plaintiff could recover for that conduct only if she could demonstrate that she was subject to a continuous policy and practice of discrimination, and that one act in furtherance of the policy and practice fell within the 300-day period.  *Bonner v. Guccione*, 178 F.3d 581, 584 (2d Cir. 1999).  A hostile work environment claim is timely, and can challenge acts occurring outside the statute of limitations period, as long as "any act that is part of the hostile work environment" occurs within the statutory time period.  *See Shomo v. City of New York*, 2009 WL 2767032, at *3 (2d Cir. 2009) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)).  If an act occurred within the statutory period,  "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (citing *Morgan*, 536 U.S. at 117).  "Under *Morgan*, a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related."  *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) (quoting *Morgan*, 536 U.S. at 115) ("[I]t does not matter whether nothing occurred within the intervening [ ] days so long as each act is part of the whole).  The Court is required to make an "individualized assessment" regarding relatedness.  *Id*. at 78 (citing *Rowe v. Hussmann Corp*., 381 F.3d 775, 781 (8th Cir. 2004) (where "it was the same harasser . . . committing the same harassing acts . . . ," concluding "as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment")).

Here, plaintiff filed a complaint with the E.E.O.C. on January 27, 2009 based upon hostile acts that allegedly occurred within the statutory period and also claims involving incidents that

occurred beyond the statutory period.  Plaintiff describes a series of discriminatory acts each allegedly perpetrated by McAndrew while plaintiff and McAndrew were employed by IFH at the SCC.  Each allegation involves discrimination based upon plaintiff's gender.  Plaintiff also claims that McAndrew's behavior was motivated by his jealousy and need to control plaintiff.  Based upon the record, the Court finds that plaintiff's hostile work environment claims are related and result from "a series of separate acts that collectively constitute one unlawful act".  *See Shomo*, 2009 WL 2767032, at *3.  Therefore, the claims are continuing violations and are not time barred.  *See Kriss v. Schenectady City Sch. Dist.*, 2010 WL 3338949, at *10 (N.D.N.Y. 2010) (the plaintiff alleged facts plausibly suggesting that the defendant created a hostile work environment rendering her claims timely in nature).   Accordingly, defendant's motion for summary judgment on this theory is denied.

**V.     Hostile Work Environment**

To succeed on a claim for hostile work environment under Title VII, plaintiff must establish: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer".  *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (citations omitted).  Plaintiff must demonstrate that the complained conduct created a hostile environment because of plaintiff's sex.  *Guarino v. St. John Fisher Coll.*, 321 F. App'x 55, 57 (2d Cir. 2009).  The standard for establishing a hostile work environment is high, *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003), and a claim cannot be based upon vague, unsupported allegations.  *Thomas v. Bergdorff Goodman, Inc.*, 2004 WL 2979960, at *7 (S.D.N.Y. 2004).

17

Plaintiff must prove both objective and subjective elements, i.e., that the conduct alleged is so severe and pervasive as to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). The Supreme Court has held that a work environment's hostility should be assessed based on the "totality of the circumstances". *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citing *Harris*, 510 U.S. at 23). Factors to consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id*. With respect to the frequency of the alleged conduct, it is not only how long the conduct lasts, but also the offensiveness of the actions that should be considered in determining whether such actions are pervasive. *Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 578 (2d Cir. 1989). Isolated, minor episodes of harassment do not, however, merit relief. *See Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997); *see also Ferguson v. New York City Transit Auth.*, 2005 WL 3149524, at *9 (E.D.N.Y. 2005) (holding that the plaintiff's claims, which occurred three months apart, were not severe or pervasive).

A workplace may be found to be hostile on the basis of gender "where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's gender". *Gregory v. Daly,* 243 F.3d 687, 695 (2d Cir. 2001); *accord Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80-81 (1998). Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive. *Oncale*, 523 U.S. at 81-82 (holding that Title VII does not establish a

"general civility code" for the American workplace).  Because a hostile work environment claim "focuses on the nature of the workplace environment as a whole," evidence of racial and sexual harassment and hostility beyond what is directed specifically at the plaintiff is relevant to the analysis.  *Williams v. Consol. Edison Corp. of N.Y.,* 255 F.App'x 546, 549 (2d Cir. 2007) (citing *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000)).   The Second Circuit has held that, "hostile work environment claims present 'mixed question[s] of law and fact' that are 'especially well-suited for jury determination'".  *Schiano v. Quality Payroll Systems, Inc*., 445 F.3d 597, 605 (2d Cir. 2006) ("an Article III judge is not a hierophant of social graces and is generally in no better position than a jury to determine when conduct crosses the line between boorish and inappropriate and actionable sexual harassment") (quotations omitted).

Here, plaintiff claims that her work environment was hostile due to a number of different incidents involving McAndrew from 2006 through 2008.  Plaintiff describes a series of incidents and alleged a pattern of activity and alleges that defendant behaved in a jealous manner and used his status as her supervisor to assert control.   *See Magill v. Precision Sys. Mfg. Inc*., 2006 WL 468212, at *2 (N.D.N.Y. 2006) ( the plaintiff's claim survived summary judgment as she established that the defendant attempted to "insinuate himself into [the plaintiff's] personal life and used his supervisory status over her as a way of controlling her")*; see also Schmidt*, 2006 WL 1307925, at *10 (the plaintiff "painted a picture of the defendant's sufficiently severe intrusion on her work environment as well as one her personal life to withstand summary judgment").  Plaintiff claims that she needed to keep her job and therefore, sought to please and appease McAndrew.

Defendant also argues that plaintiff cannot support her claim by citing acts that are gender neutral and non-sexual in nature.  Plaintiff claims that McAndrew's actions were motivated by his

jealousy and therefore, there is at least an issue of fact as to whether his monitoring of her leave time was non-sexual in nature or part of a pattern of sexual harassment.

"Facially neutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as the reasonable fact-finder could conclude that they were, in fact, based on sex." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).   If other evidence could indicate to a jury that a sex-neutral incident was, in fact, sex based, the sex-neutral incident cannot be ruled out as a component of the alleged harassment. *Schmidt v. State Univ. of New York at Stonybrook*, 2006 WL 1307925, at *9 (E.D.N.Y. 2006).

Here, the record contains ample evidence of alleged sexually based harassment that could allow a jury to conclude that the monitoring of plaintiff's time, an otherwise sex-neutral incident, was, in fact, sex-based.  *See id.* (the court found sufficient sex-based incidents to allow a jury to conclude that a facially neutral action, i.e., the defendant's emails to the plaintiff after he became upset the plaintiff was involved with another man, was also sex-based).

Taking all of the comments and incidents as a whole, there is a genuine issue as to whether plaintiff suffered from a hostile work environment.  *See Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) (the quantity of comments, touching and other conduct, when taken together, described a work environment that a jury could find inappropriate).  Viewing the record in a light most favorable to plaintiff, reasonable jurors could disagree about whether McAndrew created an environment that was hostile towards women.  Accordingly, plaintiff's claim survives summary judgment.  Thus, the dispositive issue is whether there is a basis to impute McAndrew's conduct to IFH.[5]

---

[5]  Defendant contends that courts have routinely found similar conduct to be insufficient to constitute harassment.  Defendant provides citations to several cases as support for that proposition.  The Court has reviewed those cases and finds that facts inapposite to those at hand.  In this matter, plaintiff has alleged a pattern of continuing

## VI.     Imputing Conduct to Employer

In addition to establishing that she was subjected to a hostile employment environment, plaintiff must establish that the conduct which created the hostile situation should be imputed to the employer.  *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc*., 957 F.2d 59, 63 (2d Cir. 1992). "An employer may be held vicariously liable under Title VII when a supervisor creates a hostile work environment." *Leopold v. Baccarat, Inc*., 239 F.3d 243, 245 (2d Cir. 2001) (citing *Faragher v. City of Boca Raton,* 524 U.S. 742, 765 (1998)).  If a supervisor's behavior is illegal under Title VII and culminates in a tangible employment action against the employee, the employer will be vicariously liable for it. *Mack*, 326 F.3d at 124 (citations omitted).  "Against employee claims of hostile work environment [ ], the employer may have recourse [with] the [ ] *Faragher/Ellerth* affirmative defense." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006) (citations omitted).

## A.     Supervisor

The Second Circuit has adopted a broad definition of the term "supervisor" holding that "[a]n employee is a supervisor or agent for purposes of Title VII if he has the actual authority to direct another employee's day to day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks". *Mack v. Otis Elevator Co.*, 326 F.3d 116, 126 (2d Cir. 2003) (the test for determining who is a supervisor focuses on whether the authority given to the employee by the employer enabled the employee to create a hostile work environment for his/her subordinates).  A superior with no ability to hire or fire but whose responsibilities included scheduling daily assignments, supervision and training, may be considered a supervisor. *See Faragher*, 524 U.S. at 777 .

---

harassment that allegedly occurred over a period of time.

Here, defendant argues that McAndrew did not have supervisory authority over plaintiff. While the record establishes that McAndrew was not responsible for determining plaintiff's salary, benefits or schedule, defendant's argument nonetheless lacks merit. McAndrew testified that during his employment with Mid-Hudson and IFH, there were approximately 25 employees at the SCC. McAndrew was the Medical Director at the site and supervised five nurses and three to four office staff members. Dr. Woodley, McAndrew's supervisor, did not work at the SCC. Thus, there was no superior to monitor his behavior. With respect to plaintiff, McAndrew testified, "[a] mid-wife has to be supervised by an OB-GYN" and therefore, McAndrew "had to come in and review what she had done and co-sign her charts to indicate what she had done was appropriate". Moreover, when plaintiff was offered full time employment with IFH, she was advised that the "Medical Director" of the SCC would be her supervisor. The Court concludes, as a matter of law, that McAndrew was plaintiff's supervisor and that IFH may be held vicariously liable for any of McAndrew's actions that violated Title VII. *See Mack*, 326 F.3d at 125-26.

**B.    Tangible Employment Action**

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Mack*, 326 F.3d at 124 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). As a general rule, a tangible employment action will typically occur in cases where the supervisor, "acting with the authority of the company," makes an employment decision that "inflicts direct economic harm" on the employee. *Cady v. Cortland*, 2000 WL 1456285, at *13 (N.D.N.Y. 2000); *see also Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004) (being called back early from a month-long paid vacation does not constitute a significant change in benefits); *see also Gibson v. Crucible Materials Corp.*,

290 F.Supp.2d 292, 299 (N.D.N.Y. 2003) (the plaintiff provided no evidence that she suffered any "direct economic harm" or that her responsibilities changed so as to constitute a tangible employment action).   A "tangible employment action" requires an act which the employer ratified or approved.  *Finnerty v. William H. Sadler, Inc.*, 176 F. App'x 158, 161 (2d Cir. 2006).   "[A] supervisor's tangible employment action must be related to the alleged discriminatory harassment to preclude recourse to the *Faragher/Ellerth* affirmative defense.  *Ferraro*, 440 F.3d at 102; *see also Edrisse v. Marriott Int'l Inc.*, 757 F.Supp.2d 381, 388 (S.D.N.Y. 2010) (there must be a nexus between the employment action and the harassing conduct at issue) (citing *Gorzynksi v. Jetblue Airways Corp.*, 596 F.3d 93, 103 n.3 (2d Cir. 2010).

Here, plaintiff claims that McAndrew used his position as Medical Director to audit plaintiff's use of leave time. As a result, plaintiff was so intimidated that it affected the terms and conditions of her employment and impacted upon her health.  Conversely, defendant argues that plaintiff was not demoted, her salary was not reduced, her schedule did not change and her office was not moved.

Plaintiff is still employed by IFH and does not claim that she suffered any economic loss as a result of the alleged harassing behavior.  Rather, she claims that she was so intimidated by McAndrew's behavior that she failed to take off necessary time for medical purposes.  However, plaintiff's arguments are in direct contradiction with her deposition testimony and wholly unsupported by the record.  While plaintiff claims that McAndrew began monitoring her leave in October 2006, plaintiff testified that she "took vacation/holiday" time for two weeks beginning on December 18, 2008:

> Q.   So I guess the point I am driving at, though, is you started, you
>       were out of work because of [the hand] injury you suffered

> during the course of your duties at work as early as 12/29/08; is that correct; you missed time?
>
> A.   I saw Dr. Kirby on December 16th - - no, excuse me, December 18th.   December 16th was when my hand was reinjured. December 18th I was out for two weeks.   I was already scheduled vacation anyway, so they didn't - - I was already scheduled [sic] my holiday time, so it didn't reflect being out for any injury because I was already out for the calendar for vacation.   Then I went back on January 5th.

Pl.'s Dep. 47.

The record reveals that plaintiff utilized her vacation/sick/holiday time in 2008 and does not support plaintiff's statement that she was so intimated that she neglected to take necessary time to attend to her health issues.   Plaintiff has not provided **any** evidence of **any** economic or otherwise tangible impact, damages or loss that she sustained as a result of McAndrew's alleged derogatory statements regarding her leave.   Plaintiff provides only conclusory allegations that McAndrew's conduct significantly changed or affected the terms of her employment.   *See Gonzalez v. Beth Israel Med. Ctr.*, 262 F.Supp.2d 342, 353 (S.D.N.Y. 2003) (the plaintiff produced no direct or circumstantial evidence to support her charge that she was given more work than her co-workers).   Accordingly, defendant is permitted to raise the *Faragher/Ellerth* defense.

## VII.   *Faragher/Ellerth* Defense[6]

When the alleged harasser has a supervisory position over the plaintiff, his conduct is automatically imputed to the employer, subject to proof by a preponderance of the evidence, to raise an affirmative defense that examines the reasonableness of the conduct of the employer and

---

[6] In the Answer, defendant asserts the following affirmative defenses: (1) IFH exercised reasonable care to prevent any alleged harassing conduct; (2) IFH promptly and reasonably responded to all allegations of harassing conduct; (3) Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by IFH and avoid harm; and (4) Plaintiff did not suffer a tangible employment action.   *See* IFH's Answer to Pl's Am. Cmplt, ¶ 22-25.

victim/employee. *Gorzynski*, 596 F.3d at 103; *see also Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001).   However, the affirmative defense is only available when the employer does not take any tangible employment action against the plaintiff.  *Leopold*, 239 F.3d at 245.

The *Faragher/Ellerth* affirmative defense consists of two elements:  (1) "the employer exercised reasonable care to prevent and correct promptly any harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.  The Second Circuit has held that because the employer bears the burden of proving the *Faragher/Ellerth* defense, summary judgment on this issue is cautioned against unless "the evidence is so overwhelming that the jury could rationally reach no other result." *Prince v. Madison Square Garden*, 427 F.Supp.2d 372, 382 (S.D.N.Y. 2006) (citing *Fairbrother v. Morrison*, 412 F.3d 39, 53 (2d Cir. 2005)).

**A.    First Prong**

As to the first prong of the defense, the employer need not prove success in preventing the behavior in order to establish that it took reasonable steps to prevent and correct the conduct. *Leopold*, 239 F.3d at 245.  Although it is not dispositve, one way an employer may demonstrate that they exercised reasonable care is to show that an anti-harassment policy was in place.  *Mack*, 326 F.3d at 128.   "Generalities are not enough to put an employer on notice".  *Schmidt,* 2006 WL 1307925, at *13 (citing *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243 (2d Cir. 1995)). In *Schmidt*, a case with similar factual and legal issues, the court found that the plaintiff's general comments that she was "uncomfortable" and felt that the defendant was "overbearing" fell short of establishing constructive notice of harassment.  *Id*.  Moreover, "the fact that the plaintiff

'thought' that she warned the defendant that his behavior bordered on sexual harassment did not

strengthen the plaintiff's position". *Id.*

Plaintiff argues that IFH's anti-discrimination policy was inadequate as it directed the

victim to report the harassment to a supervisory employee and in this case, McAndrew was her

direct supervisor.  Plaintiff also argues that once defendant was aware of plaintiff's complaints,

defendant's actions were not prompt because no one from IFH ever spoke with plaintiff and

during the three months between the time plaintiff called Dr. Schiller and the time plaintiff

provided Dr. Hermele's letter, McAndrew continued to harass plaintiff.

Here, it is uncontested that IFH had a policy and the record establishes that plaintiff

received a copy and was aware of the policy.  Defendant's "Protected Class Harassment Policy

and Complaint Procedure" directed an employee who had been subjected to harassment to report

the behavior "to any supervisory employee or the Human Resources Team immediately".

However, the policy also provided, "[a] confidential, anonymous Hotline is available for

employees who wish to register a complaint under this policy anonymously.  Use of this Hotline

should be restricted to those employees who wish to remain anonymous".  The Second Circuit has

"never required a company to maintain a policy that guarantees confidentiality in order to invoke

the affirmative defense. *Finnerty*, 176 F. App'x at 163 (a company could not keep a complaint

confidential and also conduct a fair and thorough investigation).

Plaintiff's claim that defendant was "aware" of her complaints of sexual harassment and a

hostile work environment as early as October 2008 is implausible.  On October 16, 2008, plaintiff

telephoned Dr. Schiller on his cell phone.  Plaintiff admitted that this call to Dr. Schiller was her

first attempt to complain to anyone in IFH's administration about McAndrew. Plaintiff did not

mention McAndrew's name during the telephone conversation with Dr. Schiller and was vague

regarding her reasons for calling.  At the same time, plaintiff also complained to Ms. Barnhart that

McAndrew was being unfair and inappropriate regarding her leave time.  Again, plaintiff never

used the words "sexual harassment" and merely assumed that Ms. Barnhart knew because, "I gave

her enough information and she is bright".   In December 2008, plaintiff first discussed

McAndrew's comments and attitude concerning plaintiff's leave with Dr. Woodley.  However,

plaintiff did not tell Dr. Woodley that she believed McAndrew was jealous nor did she advise Dr.

Woodley that the problem was of a sexual nature because she, "wouldn't discuss it on the phone".

Pl's Dep. 394.  During her deposition, plaintiff repeatedly stated that she was "uncomfortable"

discussing the "situation" over the telephone with Dr. Schiller and Dr. Woodley.  The fact that

plaintiff "assumed" or "inferred" that Dr. Schiller, Ms. Barnhart or Dr. Woodley understood her

complaints to be of a sexual nature is immaterial.  Plaintiff, by her own admission, never

referenced any sexual harassment in any of her conversations with Dr. Schiller, Ms. Barnhart or

Dr. Woodley prior to January 2009.  The record is completely devoid of any evidence establishing

that plaintiff's complaints to Ms. Barnhart or her telephone calls to Dr. Schiller or Dr. Woodley

were related to any alleged sexual harassment or hostile work environment.  Plaintiff admitted

that she was vague and that she never discussed the issue as personal or sexual in nature.  She

never told Dr. Schiller, Dr. Woodley or Ms. Barnhart about her prior romantic relationship with

McAndrew.

        The record clearly establishes that plaintiff first complained of a hostile work environment

on January 27, 2009 when plaintiff gave a copy of Dr. Hermele's note to Ms. Barnhart.  Based

upon the record, defendant's response to that complaint was prompt and thorough.   Within three

days of receiving plaintiff's complaint, IFH commenced an investigation.[7]  Mr. Shaw was retained

and conducted a thorough internal investigation while also communicating extensively with

plaintiff's counsel through multiple letters and emails.  Mr. Shaw also elicited a response and

information from McAndrew and issued a detailed report within four months.  IFH reprimanded

McAndrew and relieved McAndrew from his senior managerial position as Director of the

Department.  McAndrew is still employed with IFH at the SCC but now reports to Dr. Delma, the

Medical Director at the SCC.  Defendant also directed McAndrew to participate in harassment

training at his own expense.

Plaintiff claims that Mr. Shaw never contacted her or spoke with her, however, her

argument is misleading.  On January 30, 2009, Shaw sent correspondence directly to plaintiff.  On

February 12, 2009, plaintiff's counsel responded with a letter stating, in the first sentence, "[t]his

law firm represents Ms. Lamar with respect to the issues raised in your letter".  Thus, as plaintiff

was represented by counsel, Mr. Shaw properly directed all future correspondence and inquiries to

the attention of her counsel.[8]

Based upon the record, the Court concludes that defendant acted reasonably to prevent and

correct the alleged harassment upon receipt of plaintiff's complaint of a hostile work environment.

*See Finnerty*, 176 F. App'x at 162 (within one week after receiving the plaintiff's complaint, the

employer conducted an investigation, determined that the harasser's conduct violated policy and

---

[7] It should be noted that plaintiff "admitted" nearly every statement made by IFH in its Statement of Material Fact as it pertained to plaintiff's complaint and IFH's subsequent response.  *See* Pl's Response to Defendant's Statement of Material Facts at ¶ 74 - 86.

[8] In her opposition, plaintiff argues, "no one from defendant IFH has met with plaintif to hear her complaints, as not even Anthony Shaw in the course of his investigation spoke with Ms. Lamar".  The Court is troubled by this argument because plaintiff is currently represented by Russell A. Schindler, Esq.  Mr. Schindler submitted plaintiff's opposition to the within motion and has been involved with this matter since inception.  Indeed, Mr. Schindler drafted and signed the February 12, 2009 letter responding to Mr. Shaw's request for information from plaintiff.

formally reprimanded him and transferred the plaintiff to a new department with the same

compensation).

**B.      Second Prong**

As to the second prong, the Second Circuit has adopted a "burden shifting approach".

Once the employer has demonstrated that the plaintiff failed to avail herself of the complaint

procedure, the burden of proof shifts to the employee to come forward with an explanation why

she did not make use of the procedures.  *See Bennett v. Progressive Corp.*, 225 F.Supp.2d 190,

208 (N.D.N.Y. 2002).   Defendant may carry that burden by introducing evidence that plaintiff

failed to avail herself of the defendant's complaint procedure and then may rely on the absence or

inadequacy of plaintiff's justification for that failure.  *Ferraro*, 440 F.3d at 103 (the record

contained no evidence of any other complaints against the harasser under the complaint

procedure).  Fear or reluctance to report based upon the belief that the plaintiff would suffer

adverse employment action or be ignored must be credible.  *Leopold*, 239 F.3d at 246.  The

plaintiff must produce evidence that the employer ignored or resisted similar complaints or took

adverse action against employees in response to complaints.  *Id*.  Speculative and unsubstantiated

reasons for not reporting harassment are not recognized as valid excuses.  *Id.* at 245 (the plaintiff

did not come forward with evidence but merely asserted that she was apprehensive about speaking

up for fear of being fired because a co-worker's vague complaint was not seriously considered).

 Defendant argues that plaintiff's unreasonable refusal to complain to IFH about the

harassment does not negate the fact that she was provided with a reasonable avenue to complain.

In opposition to defendant's argument, plaintiff offers a number of explanations why she did not

avail herself of defendant's complaint procedures: (1) plaintiff argues that she attempted to report

the harassment to McAndrew's supervisor, Dr. Schiller but that Dr. Schiller never returned her

calls; (2) plaintiff claims that Dr. Woodley ignored her requests for a meeting; (3) plaintiff argues that defendant previously ignored complaints by Betty Diorio and Elba Benitez; and (4) plaintiff claims that Dr. Woodley ignored plaintiff's prior complaints about Dr. Susan Allen who referred to plaintiff as a "Barbie with breast implants".

Plaintiff claims that the company "protected" McAndrew from previous complaints by Elba Benitez and Betty Diorio.  However, the record does not support plaintiff's claims.  In February 2007, Benitez was transferred from the SCC to Port Ewen.  On February 22, 2007, Ms. Benitez wrote a letter to Dr. Calman, because she felt she was unfairly removed from the SCC. Ms. Benitez testified that Dr. Calman called her to discuss the transfer and described his response as, "very reassuring".  Dr. Calman told her, "if there was anything I needed [she] could contact him".  Benitez Dep. 16:7.  Ms. Benitez never told Dr. Calman that her problems with McAndrew were due to her gender or race.   Ms. Benitez never made any complaints to defendant that McAndrew had sexually harassed her in any manner.  *Id*. 50:5.  Ms. Diorio testified that her relationship with McAndrew was "not good" because she was hired to "keep an eye on [McAndrew]" and McAndrew was aware of the arrangement.  Diorio Dep. 8:7.  Ms. Diorio testified that McAndrew would call her names and talk about her in front of the staff.   Ms. Diorio testified that she reported that McAndrew was "inappropriate" and "disrespectful" but she could not provide specific information and did not make any complaints of sexual harassment to any supervisor at IFH.

Testimony from Ms. Benitez and Ms. Diorio does not provide adequate evidence to raise an issue of fact with regard to plaintiff's failure to avail herself of defendant's complaint procedures.  Ms. Benitez and Ms. Diorio did not make any complaints, to any IFH administrator about gender discrimination or a hostile work environment.  Indeed, Ms. Benitez and Ms. Diorio

did not make a complaints about McAndrew or any other IFH employee pursuant to the anti-

discrimination policy.  The record is devoid of any evidence that any employee made any

complaint, pursuant to the policy, that was ignored by IFH.  Plaintiff has not produced any

evidence that IFH ignored or resisted similar complaints.  *See Leopold*, 239 F.3d at 246 (the

plaintiff's concern that she would be fired for speaking up and her general claim that a

co-worker's vague and ambiguous complaint was not taken seriously were insufficient to prove

that the plaintiff's fear was credible).

   Plaintiff also claims that Dr. Woodley ignored her prior complaint about Dr. Susan Allen.

Plaintiff testified that a co-worker told her that Dr. Allen referred to plaintiff as a Barbie with

breast implants.  However, when plaintiff was asked during her deposition to describe Dr.

Woodley's response to her complaints, plaintiff testified, "I never heard from Dr. Woodley again

about it.  I don't know."  Plaintiff could not provide a time frame for the issue and conceded that

she never addressed the issue with Dr. Woodley again.  Assuming plaintiff's claims to be true,

there is no evidence that defendant ignored these complaints.  Further, plaintiff's prior complaints

regarding Dr. Allen are not "similar complaints".  Thus, plaintiff's fear that her complaints

regarding McAndrew would not be taken seriously, based upon defendant's prior response, is not

credible.

   Plaintiff argues that her attempts to report the harassment to Drs. Schiller and Woodley

were thwarted because the doctors ignored her requests to meet.  Plaintiff misinterprets the law.

"The relevant inquiry is not whether a particular avenue of complaint was effectively blocked, but

rather, whether defendants 'provided no reasonable avenue of complaint'".  *Duch v. Jakubek*, 588

F.3d 757, 763 (2d Cir. 2009).  IFH's anti-discrimination policy provided plaintiff with several

different resources and plaintiff, by her own admission, failed to avail herself of alternative

avenues.  The policy directs the employee to report the alleged harassment to **any** supervisor or the Human Resources Team.  Plaintiff admitted that she did not attempt to contact or complain to Dr. Calman because, in her opinion, that would have been pointless because, "Schiller was the only one McAndrew had respect for".  Moreover, plaintiff never attempted to call anyone in Human Resources because:

> I talked to HR about my workman's comp stuff, but I would never, ever address something with such gravity to a girl in New Paltz versus an executive above the position that I was complaining about.  It's just not appropriate to me.

Finally, the Court notes that a lengthy delay of as little as a year is sufficient by itself to demonstrate unreasonable failure to take advantage of an employer's preventive and corrective opportunities.  *See Gonzalez*, 262 F.Supp.2d at 356-57; *see also Finnerty*, 176 F. App'x at 163 (three year delay in reporting is not reasonable in the context of the affirmative defense).  Here, plaintiff claims that her relationship with McAndrew began to deteriorate in October 2006.  Plaintiff also admits that even though she contact Ms. Barnhart and Dr. Schiller in October 2008, she admittedly did not mention any sexually harassing behavior.   Even assuming plaintiff's complaints in October 2008 were sufficient to allow Ms. Barnhart or Dr. Schiller to "infer" that plaintiff complained of sexual harassment - a two year delay in reporting the behavior is unreasonable.

Thus, plaintiff's conclusory allegations are insufficient to allow a jury to conclude that she reasonably failed to avail herself of company policy.  Based upon plaintiff's lack of evidence, the Court finds that defendant has met its burden of proving the second prong of the affirmative defense and holds that plaintiff unreasonably failed to make use of the company's complaint procedure.  Plaintiff's failure to properly report the alleged harassment, "unreasonably deprived

the employer of the opportunity to investigate [her] complaints and, if necessary, undertake remedial action."  *See Petro v. Outback Steakhouse of Florida*, 2006 WL 273133, at *5 (N.D.N.Y. 2006).  Based upon the aforementioned analysis, the Court finds that IFH is entitled to summary judgment and dismissal of plaintiff's hostile work environment claims based upon the *Faragher/Ellerth* affirmative defense.[9]

## VIII.   Battery

Plaintiff asserts state law claims for battery against McAndrew and against IFH under the theory of *respondeat superior*.   IFH moves for summary judgment arguing that it cannot be held liable under that doctrine.[10]  McAndrew also moves for summary judgment and dismissal of plaintiff's claim for battery and, in the alternative, argues that the Court should decline to exercise supplemental jurisdiction over the battery claim.

"The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).  Consequently, the Court declines to exercise jurisdiction over plaintiff's battery claim and dismisses it without prejudice to re-filing in state court.  *Mormol*, 364 F.3d at 60; *see also Hartley v. Rubio*, 2011 WL 1332198, at *15 (S.D.N.Y. 2011) (the court granted summary judgment on all federal claims, therefore it declined to exercise jurisdiction over the battery claim).

## CONCLUSION

Accordingly, it is hereby

---

[9] The Court awards IFH summary judgment and orders all federal claims against IFH dismissed.  Therefore, IFH's arguments regarding plaintiff's damages and recovery under the New York Workers' Compensation Law are moot and will not be discussed herein.

[10] Plaintiff does not contest IFH's motion for summary judgment on this issue.

**ORDERED** that defendant IFH's motion for summary judgment and dismissal of plaintiff's federal claims (Dkt. No. 23) is GRANTED; and it is further

**ORDERED** that defendant IFH's motion for summary judgment (Dkt. No. 23) on plaintiff's second cause of action is DENIED; and it is further

**ORDERED** that defendant McAndrew's motion for summary judgment (Dkt. No. 21) on plaintiff's second cause of action is DENIED; and it is further

**ORDERED** that plaintiff's second cause of action is dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

The Clerk is directed to close this matter.

**IT IS SO ORDERED.**

Dated: June 16, 2011
          Albany, New York

Mae A. D'Agostino
U.S. District Judge